INHABITANTS OF HADLEY *vs.* HADLEY MANUFACTURING COMPANY.

A vote passed by a town in 1750, granting to certain individuals named " the liberty of erecting a grist mill on Fort River near Lawrence's Bridge, with the use of said stream," and accepted by the grantees, is not to be construed as a grant of land, in the absence of other evidence that the town owned the land on which the mill was erected. Nor is such ownership of land by the town proved by subsequent votes of the town, likewise accepted by the proprietors of the grist mill, requiring them to keep the bridge and the highway over it in good repair; and giving the consent of the town to the erection by them of a saw mill upon the same stream.

A grant of liberty to erect a mill on a stream, and of the use of said stream, " as long as the grantee shall keep a grist mill there in good repair," if it is to be construed a grant upon condition subsequent, is not defeated without clear proof of a breach of the condition; and, *it seems*, such breach is not shown by proof that, while a grist mill was kept there in good repair, part of the power was used for another purpose, and that in the course of one summer many persons were unable to get their grain ground there for want of water.

WRIT OF ENTRY to recover a tract of land in Hadley. Plea, nul disseizin. Trial before *Thomas*, J., who reserved the case for the consideration of the full court. So much of the evidence as is material to the understanding of the questions of law considered by the court, is stated in the opinion, which was delivered at September term 1856.

*R. A. Chapman & C. P. Huntington*, for the demandants.

*C. Delano*, for the tenants.

SHAW, C. J.   This is a real action brought to recover a tract

of land, with mills and manufactories standing thereon, and including also a right to the water power of the stream, on which they depend for motive power. The sole question is upon the demandants' title to the land. Whatever other rights or remedies they may claim or have, unless they can establish a title to the fee, they cannot maintain this action. In order to maintain the action, the demandants must establish these points :

1. That they were owners of the fee of the land now sought to be recovered, before the 7th of January 1750.

2. That they then granted the land to the predecessors of the tenants, subject to a condition subsequent, to wit, that they and their heirs and assigns should erect and maintain a grist mill on the same, in good repair.

3. That the grantees accepted said grant, and entered under it; and that their estate has come through various transfers to the tenants, who hold the estate under that title.

4. That the tenants have failed to keep a grist mill thereon, or to keep it in good repair, within the true intent and purpose of the grant; that thereby, and by force of the defeasance, the estate has become forfeited; that thereupon the demandants had a right of entry; that they have exercised that right, and actually entered, or done what is now by law necessary to enable them to recover such forfeited estate.

As the demandants claim to be in, as of their old estate, to be reinstated in the title which they had in 1750, by way of forfeiture, it is in conformity with every sound rule of construction, that, as such a claim, founded on strict law, tends to defeat an estate on which there may have been made great improvements, and after a great lapse of time, every proposition necessary to such title must be established by them by strict and satisfactory proof.

Upon the question whether the demandants, in their corporate capacity as a town in 1750, had a title in fee to the land claimed in this suit, from the nature of the inquiry we find it difficult to form a clear and satisfactory opinion. That a grant of the Indians was made to Pynchon, and by him assigned to the company of proprietors or settlers of the township of Hadley, seems

established; for though an Indian grant would not constitute of itself a title, yet Pynchon, in his assignment, recites a grant from the colonial government to the company of settlers, which was probably made, though it has not been produced. And there is also some confusion in respect to acts done by and for the proprietors as tenants in common, and the settlers of the town in their corporate capacity.

But the difficulty in our minds is not so much in these, as in some other considerations. Suppose it admitted that the town owned the whole territory in 1670, the form of their proof in the present case requires them to show that, up to 1750, the eight or ten acres now in question had never been alienated or appropriated, and of course that the town remained seized in 1750. If the negative proof is well made out, it establishes the conclusion. But here lies the difficulty. So many divisions to individuals and to companies or classes have been made, so many pitches and settings off, so many dedications of land for highways, so many votes authorizing changes of location and making compensation for inequalities, that it requires a close attention to the localities, and to the application of the various votes and records, collected and submitted, to come to a satisfactory result. Regarding the evidence, which we have examined as carefully as the nature of the case would admit, we think the demandants have not shown that the town had title to this land in 1750, but that the land in question had been embraced in some of the locations or dedications for public use made previously to that time.

But upon the second ground taken by the demandants, we are unable to perceive, in the terms of the vote of the town, that they intended to make or did make any grant of land to Edmund Hubbard and others.

We do not doubt that, at the early period in question, many grants of land were made by proprietaries, and also by towns, by vote; and that many modern titles may be traced to such an origin. But, in looking at such instruments, it is the form, and not the substance of a deed which is dispensed with. In the simplest form which can be conceived of, there must be mani-

fested an intent to convey land, by some words, however vague, indicative of such intent, with an intelligible description or designation, or by reference to some other act, record or otherwise, so as to identify the land intended to be alienated. The intent to transfer land, however circuitously or quaintly expressed, must appear. If indeed the grant is of such a nature as necessari'y implies a conveyance of land, and the corporation of proprietors passing the vote own land on which it may operate, it is proof of intent to grant.

But the vote of the town of January 7th 1750 is in these words: " Voted to Messi. Edmund Hubbard [and eight others] the liberty of erecting a grist mill on Fort River near Lawrence's Bridge, with the use of said stream, so long as they shall keep a grist mill there in good repair." This does not necessarily imply a conveyance of land. The term " liberty " is commonly used to designate some privilege, license or authority, and is quite inappropriate to the grant of land. We doubt not that a vote, by owners, of a " liberty " to enter upon and hold such a piece of land, as the grantee's share, would pass the land ; but here it is liberty to erect a mill and use the stream. This the town might well do, if they had, or believed they had, a right to the use of the stream, or if they held land which would be flowed by it, or if the mill would necessarily encroach on a highway, or otherwise affect any public right or easement.

There is an article in one of the three warrants issued by the selectmen, for calling the meeting, worthy of consideration. There were three warrants issued, one to each precinct, alike in most particulars, but not exactly alike in all. In the warrant to the third precinct, the article was " to see if the town will grant liberty for a corn mill, to be set in the highway at or near Lawrence's Bridge." Whether by law the towns had a right to authorize any such encroachment on a highway, is not now in question ; if they believed that they had, and that was the purpose of the vote, it accounts for the vote, without supposing that they had any intent to grant land, or supposed that they had any land there to grant. Most ancient highways had their origin in the appropriations made by propri-

etors, in the division and location of their common lands ; it might well be considered that those who had the power and the right to create highways might change and modify them.

It is manifest, we think, that the erection of the mill at or in the highway had some connection with Lawrence's Bridge, which probably constituted a part of the highway. It was not an unusual practice to use the same solid structure across a considerable stream, for the double purpose of raising a head of water for mill purposes, and of a bridge to accommodate ordinary travel. That there was some such connection in the present case seems probable from the vote of January 1st 1753, requiring Hubbard and others, proprietors of the mills, to give security "to keep said bridge and the way over said bridge in good repair" for five years. Nor is there any thing in the vote of August 16th 1786 inconsistent with this view. That vote only declares the consent of the town that "the owners of the grist mill at the lower end of the town should erect a sawmill upon the same stream on which the said grist mill stands," upon their giving security "to indemnify this town from all damages by reason of their digging across the causeway." This implies that the town had, or thought they had, given to these proprietors some valuable license or privilege in the stream, or in something connected with it ; but it bears no implication that they had, or thought they had, granted to said mill proprietors any land whatever. We therefore see nothing in the terms of the vote itself, or in the circumstances accompanying it, to show that the town, by this vote, owned or assumed to own the land in controversy, on which the mills were built, or that the proprietors of the mills, by accepting such license, acknowledged such title, or entered or assumed to act under said vote as a grant of land from the town.

But the court are strongly inclined to the opinion that the demandants have failed to establish a forfeiture by a nonperformance of the condition. The clause relied on is the last clause in the vote of January 7th 1850. After granting the liberty of erecting a grist mill, with the use of said stream, are these words, "so long as they shall keep a grist mill there in good repair."

Supposing the demandants are right in construing this to be a condition subsequent, it would, when expounded, stand thus: " Provided, however," or " this grant is on this condition, that if the grantees, their heirs and assigns, shall fail to keep a grist mill thereon in good repair, this conveyance shall be void."

This condition, like every condition to defeat· an estate, must be construed strictly, not to say literally. If the grantors intended more, they should have expressed it. If they intended that they should grind for the inhabitants of the town, rather than the inhabitants of other towns, it is not expressed ; no provision is made that they shall grind for customers, rather than for market. All this was left to be regulated by the usages of the country, and the laws in force regulating mills. Probably the grantors thought that, if a corn mill was erected there ·and kept in repair, it would be so much for the interest of the owners to grind for the neighbors, that they might safely rely on their own self interest to accommodate the neighborhood in which it was situated.

If it was intended that the water should be used for a grist mill only, at all times, and when there was not more than water enough for that use, it would have been so expressed ; but the condition was only to maintain one grist mill in good repair.

But even if the condition should have a more liberal construction, it is very questionable whether, upon any construction, this action could be maintained. The evidence shows that a grist mill has been and still is kept up and in good repair, with larger power than formerly ; but in the course of the summer of 1854 many persons went there, and could not get their grain ground for want of water. No action on the part of the defendant corporation is shown, indicating an intent to discontinue their grist mill ; no step taken, on the part of the town, to notify the corporation of the complaints, or require them to do their supposed duty. *Judgment for the tenants*